# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 12, 2011           Decided July 1, 2011

No. 10-1056

NATURAL RESOURCES DEFENSE COUNCIL,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

AMERICAN CHEMISTRY COUNCIL, ET AL.,
INTERVENORS

———

On Petition for Review of a Final Action
of the Environmental Protection Agency

———

*Paul Cort* argued the cause for petitioner. With him on the briefs was *Deborah Reames*.

*Stephanie J. Talbert*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *John C. Cruden*, Deputy Assistant Attorney General and *Sara Schneeberg*, Attorney, U.S. Environmental Protection Agency. *Thomas A. Lorenzen*, Attorney, U.S. Department of Justice, entered an appearance.

*Barbara Baird* argued the cause for intervenor South Coast Air Quality Management District. With her on the brief was *Kurt R. Wiese*.

*Leslie Sue Ritts*, *Claudia M. O'Brien*, *Charles H. Knauss*, *Sandra P. Franco*, *Thomas G. Echikson*, *Rachel D. Gray*, and *Adam J. White* were on the brief for intervenors for respondent American Chemistry Council, et al. *Richard P. Sobiecki* and *Stacey L. VanBelleghem* entered an appearance.

Before: ROGERS, TATEL, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Yet again we face a challenge to the Environmental Protection Agency's regulation of ozone under the Clean Air Act. At issue this time is an EPA "guidance document" addressing obligations of regions still in nonattainment of a now-revoked ozone air quality standard. Petitioner argues that the Guidance amounts to a legislative rule issued in violation of the Administrative Procedure Act's notice and comment requirement and that its substantive content is contrary to law. Firing nearly all the arrows in its jurisdictional quiver, EPA argues that petitioner lacks standing, that the Guidance does not qualify as final agency action, and that petitioner's claims are unripe for judicial review. As we explain in this opinion, all three arrows miss their target. On the merits, we conclude that the Guidance qualifies as a legislative rule that EPA was required to issue through notice and comment rulemaking and that one of its features—the so-called attainment alternative—violates the Clean Air Act's plain language. We therefore grant the petition for review and vacate the Guidance.

## I.

The Clean Air Act requires EPA to establish national ambient air quality standards (NAAQS) for certain criteria pollutants, including ozone. 42 U.S.C. § 7409(a). Regions in nonattainment of those standards are subject to "additional restrictions over and above the [Act's] implementation requirements." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 476 (2001). These additional restrictions appear in Title I, Part D of the Act. "Subpart 1 contains general nonattainment regulations that pertain to every pollutant for which a NAAQS exists. . . . Subpart 2, added by the Clean Air Act Amendments of 1990, addresses ozone." *Id.* (internal citations omitted). That latter subpart classifies nonattainment areas as either "marginal," "moderate," "serious," "severe," or "extreme," 42 U.S.C. § 7511(a)(1), giving areas with worse air quality extra time to come into compliance in exchange for imposing more stringent standards. *Id.* (listing classifications and attainment dates). Subpart 2 also contains provisions designed to encourage these regions to meet their deadlines. Central to this case, one of those provisions, section 185, directs states to impose fees on all major stationary sources in severe and extreme nonattainment areas that miss their deadlines. *Id.* § 7511d(a). Under section 185, such states must submit implementation plans, and if a state fails to do so, EPA must collect the fees itself. *Id.* § 7511d(a), (d). In addition, states failing to submit adequate implementation plans may incur penalties, including loss of federal highway funding. *Id.* § 7509(b)(1).

Until 1997, EPA had in place a 1-hour ozone NAAQS prohibiting average hourly concentrations from exceeding .12 parts per million. The 1990 amendments, including the table specifying nonattainment classifications and attainment deadlines, incorporate that 1-hour standard. *Id.* § 7511(a)(1). In 1997, however, EPA found the 1-hour standard insufficient

to "protect the public health," *id.* § 7409(b), and so promulgated an 8-hour standard of .08 parts per million. *National Ambient Air Quality Standards for Ozone: Final Rule*, 62 Fed. Reg. 38,856, 38,863 (July 18, 1997) (codified at 40 C.F.R. pt. 50) ("1997 Ozone Rule"). Because the .12 parts per million 1-hour standard roughly corresponds to a .09 parts per million 8-hour standard, the revision changed not only "the measuring stick [but also] the target." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 892 (D.C. Cir. 2006). Overall, the 8-hour standard is more protective of public health and "generally even more effective in limiting 1-hour exposures . . . than is the . . . 1-hour standard." 1997 Ozone Rule, 62 Fed. Reg. at 38,863. That said, EPA acknowledged that "it is possible that an 8-hour standard alone could allow for high 1-hour exposures of concern." *Id.* Accordingly, to ease the transition to the new standard, EPA determined that the requirements of Subpart 2, including section 185, would apply only to nonattainment under the 1-hour standard, which would remain in place until all areas achieved attainment. *Id.* at 38,873. The 8-hour standard would be implemented only under Subpart 1, a part of the statute that leaves EPA substantial regulatory flexibility.

Reviewing the 1997 rule in *Whitman v. American Trucking Ass'ns*, the Supreme Court observed that even though Subpart 2 expressly relies on the 1-hour standard, EPA remained free to revise the NAAQS. 531 U.S. at 484. Given this, the Court recognized that the statute left several gaps for EPA to fill as it implemented revised NAAQS. *Id.* at 483–84 (identifying three specific gaps related to classification and attainment deadlines). The Court nonetheless held that EPA's exemption of the 8-hour standard from the Subpart 2 requirements violated the statute. *Id.* at 484–86. According to the Court, Congress intended Subpart 2 to "eliminate[] [the] regulatory discretion" that Subpart 1 allowed and that EPA's

reading was impermissible because it "render[ed] Subpart 2's carefully designed restrictions on EPA discretion utterly nugatory." *Id.* at 484. "A plan reaching so far into the future," the Court explained, "was not enacted to be abandoned the next time the EPA reviewed the ozone standard." *Id.* at 485.

Following *American Trucking*, EPA tried again to reconcile Subpart 2 with the new 8-hour standard. *See Final Rule to Implement the 8-Hour Ozone National Ambient Air Quality Standard—Phase 1*, 69 Fed. Reg. 23,951 (Apr. 30, 2004) (codified at 40 C.F.R. pts. 50, 51, 81). In a 2004 rulemaking, the agency determined that Subpart 2 would apply only to areas in nonattainment of both the 1-hour and the 8-hour standards, but that the 1-hour standard would be withdrawn in full one year after the 8-hour standard's effective date. Pursuant to this new scheme, 76 of the 122 then-non-attaining areas would be subject only to Subpart 1. *S. Coast*, 472 F.3d at 892. Addressing one of the gaps the Supreme Court identified in *American Trucking*—relating to regional classification under the 8-hour standard—EPA noted that because net air quality had improved since 1990, some areas would have a lower classification under the 8-hour standard than they had had under the 1-hour standard. *Id.* at 890. For instance, although Baton Rouge had been a severe nonattainment area under the 1-hour standard, it was in only marginal nonattainment of the 8-hour standard. *See id.* at 899. Rather than allow such regions to loosen existing implementation standards, EPA interpreted section 172(e)—a Subpart 1 "anti-backsliding" provision that applies "[i]f the administrator *relaxes* a [NAAQS]," 42 U.S.C. § 7502(e) (emphasis added)—to apply as well where NAAQS were made more stringent. *See Final Rule to Implement the 8-Hour Ozone National Ambient Air Quality Standard—Phase 1*, 69 Fed. Reg. at 23,972 (concluding that Congress intended "that such controls not be weakened where the NAAQS is made

more stringent"). Section 172(e) provides that where EPA relaxes a NAAQS, it "shall . . . promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation." 42 U.S.C. § 7502(e). Accordingly, the 2004 Rule announced that Subpart 2 "applicable controls" had to remain in place for areas that had been in nonattainment under the 1-hour standard and were in attainment or a lower classification of nonattainment under the 8-hour standard. *S. Coast*, 472 F.3d at 890. For Baton Rouge, for instance, controls applicable to severe nonattainment regions would continue to apply despite the fact that the city qualified as a marginal nonattainment area under the new standard. Sorting through the various Subpart 2 provisions, EPA determined that some were applicable controls and others, including section 185 fees, were not. *Id.*

In *South Coast Air Quality Management District v. EPA*, we rejected a challenge to EPA's withdrawal of the 1-hour standard but vacated the portions of the rule exempting areas in nonattainment of only the 8-hour standard from Subpart 2 strictures. *Id.* at 892–95. At the least, we held, Subpart 2 must apply for areas with 8-hour concentrations exceeding .09 parts per million, the 8-hour equivalent of the 1-hour standard on which Congress relied in enacting Subpart 2. *Id.* at 892–94. For areas with 8-hour concentrations between .08 parts per million (the new standard) and .09 parts per million, we found that EPA's sole reason for excluding these areas from Subpart 2—to create regulatory flexibility and thus "maximize its own discretion"—contradicted the "clear intent of Congress." *Id.* at 894–95. We also concluded that although EPA's interpretation of section 172(e) was reasonable, the same could not be said for its exclusion of section 185 fees from

"applicable controls." *Id.* at 900, 902–03. We explained: "[a]s Congress set the penalty deadline well into the future, giving states and industry ample notice and sufficient incentives to avoid the penalties, they were 'applicable' before they were actually imposed . . . , [and] [b]ecause these penalties were designed to constrain ozone pollution, they are controls that section 172(e) requires to be retained." *Id.* at 903. Responding to EPA's argument that enforcement would be impractical because the penalty calculation relied on the no-longer-measured 1-hour standard, we warned that "section 172(e) does not condition its strict distaste for backsliding on EPA's determinations of expediency; EPA must determine its procedures *after* it has identified what findings must be made under the Act." *Id.* In sum, we ruled that pursuant to section 172(e)'s anti-backsliding principles, an area subject to section 185 penalties due to its classification under the now-defunct 1-hour standard must apply those penalties as an "applicable control" if the area missed its attainment deadline under the 1-hour standard.

Now before us is EPA's latest attempt to reconcile the 8-hour standard with Subpart 2. This time its effort relates only to the application of section 185 fees to the eight regions in severe or extreme nonattainment of the 1-hour standard: Baltimore, Baton Rouge, Houston, New York City, Sacramento, the San Joaquin Valley, the South Coast Air Basin (CA), and the Southeast Desert (CA). Because attainment deadlines for the eight regions have now expired, all are in the process of developing section 185 implementation plans. Faced with the prospect of hefty fees, industry groups complained to EPA that because they already had in place the best available emission control technology, they could reduce emissions and thus avoid fees only by cutting production. *Report of the US EPA Clean Air Act Advisory Committee Task Force on Section 185 of the Clean*

*Air Act* 3 (May 12, 2009) (included at J.A. 56). Moreover, they asserted, because section 185 set such a low emissions threshold for major stationary sources, the fees would apply to many small businesses, as well as to hospitals and schools. *Id.* at 4. Lastly, they alleged that stationary sources contribute far less to overall air pollution today than they did in 1990 and face far higher marginal costs for further reduction than do mobile sources. *Id.* at 3.

To address these concerns, the Clean Air Act Advisory Committee, a body created by the 1990 Amendments to advise EPA on scientific and industry developments relevant to rule making, established a task force that generated a list of section 185 alternatives including shifting costs to mobile sources and implementing market-based programs. Environmental organizations participating in the task force submitted an "Alternative Opinion" criticizing the policy rationales of the industry groups and asserting that the statute allowed no alternatives. The Committee submitted the task force report to EPA along with the following question: "Is it legally permissible under either section 185 or 172(e) for a State to exercise the discretion identified in [the options listed in this letter]?" Letter from Eddie Terrill & Robert Wyman, Co-chairs of the Section 185 Task Force, to Elizabeth Craig, Acting Assistant Administrator, Office of Air & Radiation (May 16, 2009) ("*Task Force Letter*") (included at J.A. 51).

In response, EPA issued a "Guidance" document aimed at Regional Air Division Directors—the agency officials directly responsible for implementation plan approval. That January 5, 2010, document explains to Directors that

> [i]n the implementation rule for the 1997 ozone NAAQS, EPA determined that although section 172(e) does not directly apply where

EPA has strengthened the NAAQS, as it did in 1997, it was reasonable to apply the same principle for the transition from the 1-hour NAAQS to the 1997 8-hour NAAQS. As part of applying the principle in section 172(e) for purposes of the transition from the 1-hour standard to the 1997 8-hour standard, EPA can either require states to retain programs that applied for purposes of the 1-hour standard, or alternatively can allow states flexibility to adopt alternative programs, but only if such alternatives are 'not less stringent' than the mandated program.

Memorandum from Stephen D. Page, Director, Office of Air Quality Planning & Standards to Regional Air Division Directors 3 (Jan. 5, 2010) ("*Fee Program Guidance*") (included at J.A. 66). In other words, EPA believes 1-hour nonattainment areas have flexibility to choose between the statutorily mandated program and an equivalent—i.e., the program alternative.

In addition to that alternative, the Guidance explains, regions attaining either the 1-hour or the 8-hour standard can avoid section 185 fees through an "attainment alternative." Specifically, in such regions the existing 8-hour implementation controls would qualify as a "not less stringent" alternative to section 185 fees. *Id.* at 3–4. In other words, a region satisfying the 8-hour standard would have no obligation to pay section 185 fees even though it remained in nonattainment of the 1-hour standard. The Guidance sets forth two justifications for the attainment alternative. First, "it would unfairly penalize sources in these areas to require that fees be paid after an area has attained the 8-hour standard due to permanent and enforceable emission reductions because the

fees were imposed due to a failure to meet the applicable attainment deadline for the 1-hour standard, not any failure to achieve the now applicable 8-hour standard by its attainment date." *Id.* at 4. Second, because EPA no longer redesignates areas under the 1-hour standard, "relief from the 1-hour fee program requirements under the terms of the statute is an impossibility, since the conditions the statute envisioned for relieving an area of its fee program obligation"— reclassification as in attainment of the 1-hour standard—"no longer can exist." *Id.*

As to both the program and attainment alternatives, the Guidance explains that approval of individual alternatives would occur on a case-by-case basis. Specifically, if after preliminarily assessing a proposal, EPA were to find the alternative satisfactory, it would proceed with notice and comment to finalize that finding. *Id.* at 3.

On March 5, 2010, the Natural Resources Defense Council (NRDC) filed a petition for review of the Guidance pursuant to Clean Air Act section 307(b)(1), which gives this court exclusive jurisdiction over challenges to final EPA actions. 42 U.S.C. § 7607(b)(1). NRDC argues that EPA violated the Administrative Procedure Act by issuing the Guidance without notice and comment and that both the program and attainment alternatives violate the Clean Air Act. In response, EPA argues that NRDC lacks standing, that the Guidance fails to qualify as final agency action, and that NRDC's challenges are unripe for review. On the merits, EPA contends that the Guidance is either a policy statement or an interpretive rule and, in either case, is exempt from the notice and comment requirement. It also defends both alternatives as permissible exercises of statutory gapfilling. Numerous industry groups and the South Coast Air Quality Management District have intervened in support of EPA.

**II.**

NRDC argues that it has "organizational standing" due to alleged injuries suffered by two of its members. *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002) (listing three requirements of organizational standing, only one of which—that at least one member would have standing to sue in her own right—is at issue in this case); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (to demonstrate that a member would have standing to sue in her own right, the organization must establish that she has suffered injury, caused by the defendant's action, and redressable through this claim). Both members live in 1-hour nonattainment areas (one in the Houston area, which has an attainment deadline of November 15, 2007, and the other in the San Joaquin Valley, which has a deadline of November 15, 2010), and both assert that local ambient ozone levels have adversely affected their health and forced them to reduce time they spend outside. *See* Marilyn McGill Aff. ¶¶ 2, 6; Gaylee Amend Aff. ¶¶ 2, 6–8; *see also* 42 U.S.C. § 7511(a)(1); *Approval and Promulgation of Implementation Plans; Texas; Houston/Galveston Nonattainment Area; Ozone*, 66 Fed. Reg. 57,160 (Nov. 14, 2001) (codified at 40 C.F.R. pt. 52) (approving plan for Houston, a severe nonattainment area, to achieve attainment by 2007); *Clean Air Act Reclassification; San Joaquin Valley Nonattainment Area*, 69 Fed. Reg. 20,550 (Apr. 16, 2004) (codified at 40 C.F.R. pt. 81) (reclassifying the San Joaquin Valley as an extreme nonattainment area and therefore pushing the attainment deadline to 2010 from 2005). According to NRDC, the Guidance exacerbates these injuries by delaying or suspending future air quality improvements. Any such effect, EPA counters, is purely hypothetical because it may never approve an alternative.

In our view, the Guidance injures NRDC's members in three independent ways. First, the Guidance caused several nonattainment areas, including Houston and the San Joaquin Valley, to abandon plans to submit section-185-compliant implementation plans, thus delaying, at the very least, implementation of section 185, which in turn delays the reduction of ambient ozone and harms NRDC members. *See* Elena Craft Aff. ¶¶ 7–9; Sarah Jackson Aff. ¶¶ 6–12. Second, even in the San Joaquin Valley, where the attainment deadline had not yet passed at the time NRDC filed this petition, the Guidance had a present, concrete effect because it eliminated section 185's powerful incentive for major stationary sources to reduce emissions before the deadline. *See S. Coast*, 472 F.3d at 903 (explaining that even where a nonattainment deadline has yet to pass, section 185 is currently applicable because it incentivizes emission reductions before fees are implemented). Third, because the Guidance replaces a brightline section 185 requirement with a flexible standard, it is likely to result in lengthier rulemaking processes. And because an order vacating the Guidance would require Houston and the San Joaquin Valley to submit section-185-compliant state implementation plans (or, if they failed to do so, because EPA itself would be obligated to implement section 185, *see* 42 U.S.C. § 7511d(d)), these injuries are all redressable. *See* Recording of Oral Arg. at 31:05–09 (counsel for EPA clarifying that were we to vacate the Guidance, nonattainment regions would remain obligated to submit SIPs under existing deadlines and would not receive extensions related to future rulemakings); *Lujan*, 504 U.S. at 562 (explaining that where "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation [of a third party]" the critical question is how the third party would respond to an order declaring the government's action illegal).

EPA nonetheless insists that the Guidance causes no injury because any approved alternative program will, by definition, be "not less stringent" than section 185 fees. Of course, this argument carries absolutely no weight with respect to the attainment alternative for which the Guidance requires no equivalency analysis. The argument is also unpersuasive with respect to the program alternative. To begin with, it is possible that a plan EPA might legitimately find equivalent to a section 185 penalty (and which we would thus uphold on the merits) could nonetheless be so meaningfully different as to cause cognizable Article III injury. In any event, even assuming that a resulting program were perfectly equivalent, the delay in improving air quality would still injure NRDC members. EPA's argument also proves far too much. Were EPA to prevail, although NRDC might well have standing to bring an as-applied challenge to any particular "not less stringent" determination, no one would have standing to challenge EPA's authority to allow alternatives in the first place. Especially given that Congress enacted Subpart 2 for the very purpose of curtailing EPA discretion, *see Am. Trucking*, 531 U.S. at 484–86, it would be ironic indeed if the application of standing doctrine allowed EPA to effectively maintain that very discretion. Neither precedent nor logic requires us to adopt such a counterintuitive approach to standing.

The next two jurisdictional issues—finality and ripeness—turn on the same question: whether the Guidance announces a binding change in the law. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (explaining that to be final, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow" (internal quotation marks omitted)); *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)

(identifying finality as a necessary feature of fitness for review). It did. Prior to issuing the Guidance, neither the statute nor EPA regulations nor case law authorized EPA regional directors to approve implementation plans containing alternatives to section 185 fees. Conceding as much with respect to regulations and case law, EPA argues that section 172(e) expressly authorizes alternatives in this specific context. We disagree. Although section 172(e) does allow EPA to sanction alternatives where it *relaxed* the NAAQS, nothing in the statute expressly addresses situations where, as here, EPA *strengthened* the NAAQS. Accordingly, while section 172(e) expressly contemplates alternatives, its application in this context requires interpretation—a point EPA acknowledges elsewhere when it asserts that "there is a gap in the statute that the EPA must fill." Resp't's Br. 34. This is all the more so with respect to the attainment alternative: because section 172(e) protects against backsliding from an *old* standard, nothing in it hints that a state could escape from its strictures by satisfying a *new* standard.

EPA insists that the Guidance changed nothing because prior to its issuance, a regional director could have considered an alternative. Perhaps so, but that director also retained discretion, now withdrawn by the Guidance, to reject the alternative solely for failing to comply with section 185. Indeed, this is essentially what happened when the San Joaquin Valley Unified Air Pollution Control District submitted a section 185 plan that exempted certain major stationary sources. After notice and comment, EPA rejected the plan for failure to comply with section 185, explaining that because San Joaquin never characterized the plan as an alternative, EPA had no need to "take a final position regarding whether it could approve a substitute program for the program specified under [Clean Air Act] section 185."

*Revisions to the California State Implementation Plan, San Joaquin Valley United Air Pollution Control District*, 75 Fed. Reg. 1716, 1717–18 (Jan. 13, 2010). In other words, had San Joaquin asked EPA to treat its proposal as an alternative, the regional director might have performed an equivalency analysis or determined that alternatives were categorically unacceptable. Post-Guidance, however, the director may no longer reject a plan on the latter ground. The permissibility of alternatives is now a closed question, and the Guidance leaves to future rulemakings only the issue of whether a specific proposed alternative satisfies the program or attainment option.

The Guidance's language supports the conclusion that EPA has definitively interpreted section 172(e) as permitting alternatives. The Guidance explains that "EPA is electing to consider alternative programs to satisfy the section 185 fee program [implementation plan] revision requirement," and the document announces that "[i]f [EPA's] preliminary assessment indicates that the alternative program is not less stringent, we would issue a notice in the Federal Register proposing to make such a determination." *Fee Program Guidance* at 3. By contrast, with regard to approvability of individual plans, the document expressly reserves discretion for future administrative action: "The remainder of this memorandum describes the circumstances under which we believe we can approve an alternative program that is 'no less stringent.' These interpretations will only be finalized through . . . notice-and-comment rulemaking to address the fee program obligations associated with each applicable nonattainment area." *Id.*

In sum, then, the Guidance altered the legal regime by resolving the question posed by the Clean Air Act Advisory Committee: "Is it legally permissible under either section 185

or 172(e) for a State to exercise the discretion identified in [the options listed in this letter]?" *Task Force Letter*. Answering that question affirmatively, the Guidance binds EPA regional directors and thus qualifies as final agency action. *Bennett*, 520 U.S. at 177–78; *see also Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1020–23 (D.C. Cir. 2000) (explaining that for the purposes of finality, it is irrelevant how the interpretation will apply to any individual state's SIP-approval process). Moreover, because the Guidance is final, and because the issue raised by NRDC is purely legal, the question before us is fit for judicial review. *See Cement Kiln Recycling Coal. v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) ("[A] purely legal claim in the context of a facial challenge is presumptively reviewable." (internal quotations marks and ellipses omitted)); *see also Abbott Labs.*, 387 U.S. at 149 (describing the fitness requirement). And because "Congress has emphatically declared a preference for immediate review" with respect to Clean Air Act rulemaking, we have no need to consider the ripeness test's second element, namely, the hardship to the parties of withholding review. *Cement Kiln Recycling Coal.*, 493 F.3d at 215; *see also Natural Res. Def. Council v. EPA*, 22 F.3d 1125, 1133 (D.C. Cir. 1994) (finding such congressional intent in the sixty day time limit in the Clean Air Act judicial review provision—the same provision governing review in this case—and concluding, therefore, that the court need not consider hardship).

## III.

Given that the Guidance document changed the law, the first merits question—whether the Guidance is a legislative rule that required notice and comment—is easy. *See 5 U.S.C. § 553* (requiring that legislative rules, but not policy statements or interpretive rules, be issued only after notice and comment). To begin with, because the Guidance binds EPA regional directors, it cannot, as EPA claims, be

considered a mere statement of policy; it is a rule. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("[P]olicy statements are binding on neither the public nor the agency." (internal citation omitted)); s*ee also Cement Kiln Recycling Coal.*, 493 F.3d at 226 & n.14 (finding that the inquiries into whether the agency action was final and whether the agency action was a rule were essentially the same). Moreover, contrary to EPA's alternative argument, this rule is not interpretive; it is legislative. As we explained above, nothing in the statute, prior regulations, or case law authorizes EPA to accept alternatives to section 185. Likewise, nothing prior to the Guidance entitled a state to have EPA evaluate a proposed alternative for equivalency rather than reject it outright. Accordingly, the Guidance qualifies as a legislative rule that EPA had no authority to issue without notice and comment. *See Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C. Cir. 1993) (stating that where "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties," the rule is legislative).

Having concluded that EPA issued the Guidance in violation of the Administrative Procedure Act's notice and comment requirement, we could simply vacate and end this opinion. NRDC, however, urges us to resolve its substantive claims, arguing that "a ruling on these questions is in the interest of judicial and administrative economies." Pet'r's Br. 26. Our case law provides little direction on whether, having determined to vacate on procedural grounds, we should nonetheless address substantive claims. *Compare Sprint Corp. v. FCC*, 315 F.3d 369, 377 (D.C. Cir. 2003) (remanding without reaching substantive claims), *and Syncor Int'l Corp.*, 127 F.3d at 96 (same), *with Air Transp. Ass'n of Am. v. FAA*, 169 F.3d 1, 4–6, 8 (D.C. Cir. 1999) (reaching statutory claims

but declining to evaluate arbitrary and capricious challenges), *Owner-Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 206 (D.C. Cir. 2007) (vacating a portion of a rule both because agency failed to provide an opportunity for comment and because agency failed to provide adequate explanation), *and Ala. Power Co. v. FERC*, 160 F.3d 7, 11 (D.C. Cir. 1998) (finding it appropriate to proceed to petitioner's argument that agency lacked authority to take challenged action after having found that agency failed to follow required procedure in taking that action).

In deciding how to proceed here, we keep in mind two competing interests. On the one hand, we must avoid prejudging the notice and comment process, the very purpose of which is to give interested parties the opportunity to participate in rulemaking and to ensure that the agency has before it all relevant information. *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1140–41 (D.C. Cir. 1995). On the other hand, were we to vacate the Guidance without passing on the validity of the two alternatives, we could exacerbate the very delay that is injuring NRDC's members.

Evaluating the program alternative in light of these considerations, we believe that the interest in preserving the integrity of the notice and comment process strongly outweighs any concern about delay. Because neither the statute nor our case law obviously precludes that alternative, we believe that by weighing in now we would unfairly prejudge any future notice and comment process.

The attainment alternative presents a very different situation. Because it violates the statute's plain language and our precedent, nothing would be gained by postponing a decision on the merits. Indeed, doing so would exacerbate the delay that is harming NRDC.

We begin with the statute. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984) ("First, always, is the question whether Congress has directly spoken to the precise question at issue."). Section 172(e)'s plain language requires that any alternative be "not less stringent than applicable controls." Recall that under the attainment alternative, an area need achieve only one or the other of the two NAAQS, meaning that an area in attainment of the 8-hour standard may treat its 8-hour implementation plan as an alternative to section 185 fees for 1-hour nonattainment. Although it is theoretically possible that controls in place to meet the 8-hour standard in a particular region could be equivalent to the section 185 penalties under the 1-hour standard, EPA does not purport to draw such a conclusion. Instead, EPA equates the purpose of retaining section 185 as an anti-backsliding measure (to achieve attainment) with the purpose of 8-hour attainment controls (to achieve attainment). But it ignores the fact that to satisfy section 172(e), the alternative must be "not less stringent" than the applicable control required to attain the superseded standard. In other words, those two attainments are of different standards.

The attainment alternative also exceeds several of the limits to EPA's gapfilling discretion that we identified in *South Coast*. *See Sierra Club v. EPA*, 479 F.3d 875, 878, 880 (D.C. Cir. 2007) (per curiam) (explaining that where EPA violates "the Clean Air Act's plain language as interpreted by [our precedent]" that is " 'the end of the matter' " (quoting *Chevron*, 467 U.S. at 842)). First, we held that applicable controls "must be enforced under the one-hour NAAQS." *S. Coast*, 472 F.3d at 903. Expressly contradicting that directive, the attainment alternative requires enforcement of section 185 in only a subset of the 1-hour nonattainment regions—those

also in nonattainment of the 8-hour standard. Second, we explained that the purpose of maintaining "applicable controls" under the 1-hour standard was not to achieve attainment of the new standard, but rather to prevent backsliding from the old standard. *Id.* at 900 ("Considered as a whole, the Act reflects Congress's intent that air quality should be improved until safe and never allowed to retreat thereafter. Even if EPA set requirements that proved too stringent and unnecessary to protect public health, EPA was forbidden from releasing states from these burdens."). In other words, the Act creates a one-way ratchet, "plac[ing] states onto a one-way street whose only outlet is attainment" of the NAAQS—even NAAQS EPA has subsequently replaced. *Id.* Because the attainment alternative allows violations of the 1-hour standard to continue, it makes the ratchet two-way—a clear violation of the statute. Finally, we rejected EPA's argument that because it would no longer be making attainment findings under the 1-hour standard, it could refrain from enforcing section 185 on regions in severe and extreme nonattainment of that standard. Repeating this argument here, EPA tells us that because it "no longer promulgates redesignations for the 1-hour standard because that standard has been revoked . . . relief from the 1-hour fee program requirements under the terms of the statute is an impossibility, since the conditions the statute envisioned for relieving an area of its fee program obligation no longer can exist." *Fee Program Guidance* at 4. In *South Coast*, however, we explained that "section 172(e) does not condition its strict distaste for backsliding on EPA's determinations of expediency; EPA must determine its procedures *after* it has identified what findings must be made under the Act." 472 F.3d at 903. The same is true here.

In concluding that EPA has once again "failed to heed the restrictions on its discretion set forth in the [Clean Air] Act,"

*S. Coast*, 472 F.3d at 886, we recognize that EPA believes "it would unfairly penalize sources in these areas to require that fees be paid after an area has attained the 8-hour standard due to permanent and enforceable emission reductions because the fees were imposed due to a failure to meet the applicable attainment deadline for the 1-hour standard, not any failure to achieve the now applicable 8-hour standard by its attainment date." *Fee Program Guidance* at 4. But as we have said before, "[i]f the Environmental Protection Agency disagrees with the Clean Air Acts' requirements . . . , it should take its concerns to Congress. . . . In the meantime, it must obey the Clean Air Act as written by Congress and interpreted by this court." *Sierra Club*, 479 F.3d at 884.

## IV.

For the foregoing reasons, we grant the petition for review and vacate the Guidance.

*So ordered.*