**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL and COMMUNITIES FOR A BETTER ENVIRONMENT, *Petitioners*, | No. 13-70544 |
| v. | OPINION |
| U.S. ENVIRONMENTAL PROTECTION AGENCY; LISA P. JACKSON, Administrator, U.S. Environmental Protection Agency; JARED BLUMENFELD, Regional Administrator, Region IX, U.S. Environmental Protection Agency, *Respondents*, | |
| NATIONAL ENVIRONMENTAL DEVELOPMENT ASSOCIATION'S CLEAN AIR PROJECT; SOUTH COAST AIR QUALITY MANAGEMENT DISTRICT; SAN JOAQUIN VALLEY UNIFIED AIR POLLUTION CONTROL DISTRICT, *Respondents-Intervenors*. | |

On Petition for Review of an Order of the
Environmental Protection Agency

Argued and Submitted
February 12, 2015—San Francisco, California

Filed March 11, 2015

Before: Mary M. Schroeder, Senior Circuit Judge, Barry G.
Silverman, Circuit Judge, and Marvin J. Garbis, Senior
District Judge.[*]

Opinion by Judge Silverman

## SUMMARY[**]

### Environmental Law

The panel denied a petition for review of an order of the United States Environmental Protection Agency approving the South Coast Air Quality Management District's Rule 317 as a revision to California's State Implementation Plan for the Clean Air Act.

The EPA approved the rule pursuant to § 172(e) of the Clean Air Act after finding that the pollution controls it imposed were "not less stringent than" § 185 of the Clean Air Act, which requires that major stationary sources of pollution in severely polluted areas pay fees for their emissions.

---

[*] The Honorable Marvin J. Garbis, Senior District Judge for the U.S. District Court for the District of Maryland, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Applying *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), deference, the panel held that the EPA reasonably found that § 172(e) contained an ambiguous gap. The panel also held that the EPA's interpretation of that ambiguity was reasonable – i.e., that the Clean Air Act's anti-backsliding provisions, allowing for not less stringent alternative controls, applied when air quality standards have been strengthened as well as when they have been relaxed.

## COUNSEL

Paul Cort (argued) and Adriano Martinez, Earthjustice, San Francisco, California, for Petitioners.

Heather Gange (argued) and Sam Hirsch, Acting Assistant Attorney General, United States Environmental Protection Agency, Environmental Defense Section, Environment & Natural Resources Division; Kara Christenson and David Coursen, United States Equal Protection Agency, Office of General Counsel, Washington, D.C., for Respondents.

Kurt Weise, General Counsel, Barbara Baird (argued), Chief Deputy Counsel, William Wong, Principal Deputy Counsel, and Megan Lorenz Angarita, Senior Deputy Counsel, South Coast Air Quality Management District, Diamond Bar, California, for Respondent-Intervenor South Coast Air Quality Management District.

Annette Ballatore-Williamson (argued), District Counsel, and Jessica Hafer Fierro, Assistant District Counsel, San Joaquin Valley Unified Air Pollution Control District, Fresno,

California, for Respondent-Intervenor San Joaquin Valley Unified Air Pollution Control District.

Leslie Sue Ritts, Ritts Law Group, PLLC, Alexandria, Virginia, for Respondent-Intervenor National Environmental Development Association's Clean Air Project.

Curtis L. Coleman, Law Offices of Curtis L. Coleman, Los Angeles, California, for Amicus Curiae Southern California Alliance of Publicly Owned Treatment Works.

Robert Wyman, Jr. and John Heintz, Latham & Watkins LLP, Los Angeles, California, for Amici Curiae Los Angeles Chamber of Commerce, Los Angeles County Business Federation, California Council for Environmental and Economic Balance, the California Small Business Alliance, and Regulatory Flexibility Group.

## OPINION

SILVERMAN, Circuit Judge:

Petitioners Natural Resources Defense Council and Communities for a Better Environment petition for review of the United States Environmental Protection Agency's approval of the South Coast Air Quality Management District's Rule 317 as a revision to California's State Implementation Plan for the Clean Air Act. EPA approved the rule pursuant to § 172(e) of the CAA after finding that the pollution controls it imposes are "not less stringent than" § 185 of the CAA, which requires that major stationary sources of pollution in severely polluted areas pay fees for their emissions.

Everyone agrees that § 172(e) of the CAA (the so-called "anti-backsliding" provision) allows EPA to approve alternate pollution controls that are "not less stringent than the controls" already in effect when a national primary ambient air quality standard is *relaxed.* But what is EPA's authority when the standard is *tightened*? May EPA approve "not less stringent" standards then, too? Section 172(e) doesn't say one way or the other.

Petitioners do not argue that Rule 317 *is* weaker than the controls that existed before. (The controls in Rule 317 are, in fact, *more* stringent.) Rather, petitioners' argument is statutory, not factual. They argue that EPA lacked the statutory authority to approve *any* alternative rule (even one imposing more stringent controls) because, they assert, § 172(e) unambiguously applies only when air quality standards are relaxed, not when they are tightened.

Applying the deference called for by *Chevron, U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984), we hold today that EPA reasonably found that § 172(e) contains an ambiguous gap. We also hold that EPA's interpretation of that ambiguity was reasonable – i.e., that the CAA's anti-backsliding provision, allowing for not less stringent alternative controls, applies when air quality standards have been strengthened as well as when they have been relaxed. We deny the petition for review.

## I. *Background*

### A. Clean Air Act Background

The Clean Air Act requires that EPA establish primary and secondary national ambient air quality standards

("NAAQS") for pollutants, including ozone, determining what levels of these may safely be in the air. CAA §§ 108–109, 42 U.S.C. §§ 7408–7409. Areas where the air quality meets or exceeds the NAAQS (i.e., where pollutant levels are low) have attained the NAAQS, and so are known as "attainment areas," while areas with pollutant levels greater than prescribed in the NAAQS are "nonattainment areas." CAA § 107, 42 U.S.C. § 7407. States with nonattainment areas must work to reach attainment by developing State Implementation Plans ("SIPs") that plot out the path to better air; EPA in turn must ensure that each SIP complies with the CAA. CAA § 110, 42 U.S.C. § 7410.

When the CAA was amended in 1990, areas designated as "severe" or "extreme" nonattainment areas under the NAAQS that was then in place became subject to "penalties to provide incentives for major polluters to reduce VOC [volatile organic compound] emissions." *S. Coast Air Quality Mgmt. Dist. v. EPA*, 472 F.3d 882, 888 (D.C. Cir. 2006) ("*South Coast*"). Section 185, the CAA provision that effectuates these penalties, sets forth the general rule that each "major stationary source" located in a severe or extreme nonattainment area must pay this penalty, and also prescribes specifically how penalties must be calculated and collected. 42 U.S.C. § 7511d.[1]

---

[1] 42 U.S.C. § 7511d reads in full:

(a) General rule

Each implementation plan revision required under section 7511a(d) and (e) of this title (relating to the attainment plan for Severe and Extreme ozone nonattainment areas) shall provide that, if the area to which such plan revision applies has failed to attain the

For years, EPA set the NAAQS using a one-hour average measurement standard. *See* Revisions to the National Ambient Air Quality Standards for Photochemical Oxidants, 44 Fed. Reg. 8,202 (Feb. 8, 1979) (codifying one-hour standard). In 1997, after much review, EPA determined that it would start using a standard in which the NAAQS was set by an average over eight hours. NAAQS for Ozone, 62 Fed. Reg. 38,856 (July 18, 1997). The previous one-hour NAAQS, translated arithmetically to the new eight-hour NAAQS, would have been 0.09 parts per million (ppm), but under the eight-hour standard going forward, the NAAQS would allow only 0.08 ppm of ozone in the air. "The new standard thus both changed the measuring scheme" – going from a one-hour average to eight hours – "and was marginally more stringent." *South Coast*, 472 F.3d at 888. Originally, EPA planned to just phase out the one-hour standard, but it subsequently revoked that standard entirely.

The 1990 revisions of the CAA relied on the one-hour NAAQS in setting certain classifications, but the amendments did "contemplate[] that EPA could change the NAAQS based upon its review of 'the latest scientific knowledge useful in indicating the kind and extent of all identifiable effects on

_____

national primary ambient air quality standard for ozone by the applicable attainment date, each major stationary source of VOCs located in the area shall, except as otherwise provided under subsection (c) of this section, pay a fee to the State as a penalty for such failure, computed in accordance with subsection (b) of this section, for each calendar year beginning after the attainment date, until the area is redesignated as an attainment area for ozone. Each such plan revision should include procedures for assessment and collection of such fees.

public health' that the pollutant may cause." *Id.*, quoting CAA §§ 108(a), 109(d), 42 U.S.C. §§ 7408(a), 7409(d). In particular, § 172(e) of the CAA guards against backsliding in air quality in the wake of changes to the NAAQS. Section 172(e) provides:

> (e) Future modification of standard
>
> If the Administrator relaxes a national primary ambient air quality standard after November 15, 1990, the Administrator shall, within 12 months after the relaxation, promulgate requirements applicable to all areas which have not attained that standard as of the date of such relaxation. *Such requirements shall provide for controls which are not less stringent than the controls applicable to areas designated nonattainment before such relaxation*.

CAA § 172(e), 42 U.S.C. § 7502(e) (emphasis added). Thus, even if the NAAQS is "relaxed," which would reflect a view that more pollutants can be in the air than previously thought, states are still not allowed to loosen their air pollution controls.

## B. Previous Decisions Addressing the Impact of the Revised NAAQS

Soon after EPA announced that it would adopt the more stringent eight-hour NAAQS, various parties challenged EPA's plan for implementing it. First, in *Whitman v. American Trucking Assn's*, the Supreme Court ruled that EPA could not implement the eight-hour standard under the pre-

1990 sections of the CAA alone, because to do so amounted to a rejection of the amendments' detailed scheme and limitations on EPA's and states' discretion in administering the CAA. 531 U.S. 457 (2001). In light of this conclusion, EPA promulgated a new rule that fully revoked the one-hour NAAQS, created a classification table for air quality regions based on the new settings, and made only regions that were classified as "nonattainment" under *both* the old and new NAAQS subject to the 1990 amendments' strictures. *See* Final Rule To Implement the 8-Hour Ozone National Ambient Air Quality Standard – Phase 1, 69 Fed. Reg. 23,951 (Apr. 30, 2004) (codified at 40 C.F.R. parts 50, 51, 81) ("2004 Rule"). EPA also interpreted § 172(e)'s anti-backsliding rule to apply, even though the NAAQS was strengthened instead of relaxed, so that any areas that were classified as "severe" or "extreme" nonattainment areas under the one-hour NAAQS, would remain subject to certain controls, even though the NAAQS mandating those controls (the one-hour standard) was revoked. *Id.* at 23,972. However, EPA interpreted "controls" to exclude many of the controls mandated by the 1990 amendments, including § 185's fee for major stationary sources. *Id.* at 23,984.

This approach, too, was challenged, resulting in the *South Coast* case. In that case, as relevant here, the D.C. Circuit upheld the revocation of the one-hour NAAQS as long as adequate anti-backsliding controls relating to the old standard were kept, but ruled that EPA's definition of "controls" to exclude § 185 was an abuse of discretion. *South Coast*, 472 F.3d at 899–900. The D.C. Circuit explained that the anti-backsliding requirements for regions designated nonattainment under the one-hour NAAQS was all that was left of that NAAQS, and those requirements must be kept in order to effectuate the EPA's purpose of continuous

improvement of air quality with no retreat. *See id.* at 900. Therefore, EPA could not define "controls" to exclude § 185. *Id.* at 902–903. But in agreeing that §172(e)'s anti-backsliding principle must be respected, the D.C. Circuit agreed with EPA that § 172(e) applied as EPA had determined, even though the new NAAQS was stricter, rather than relaxed as provided for in the statute's text. *Id.* at 900. Thus § 172(e) applied when standards were strengthened as well as when they were relaxed.

After this approval of its application of § 172(e) in the context of a stronger NAAQS, EPA issued a guidance document providing an overview of controls that could be implemented in lieu of § 185 if they were "not less stringent," as required by § 172(e). The D.C. Circuit vacated the guidance document on the basis that it should have been issued via notice and comment procedures. *Natural Res. Def. Council v. EPA*, 643 F.3d 311, 321 (D.C. Cir. 2011) ("*NRDC I*"). The court also disagreed with EPA's view "that § 172(e) expressly authorizes alternatives in this specific context," since the statute does not provide for the context of the NAAQS being strengthened, and while noting that "neither the statute nor our case law obviously precludes" EPA from approving alternatives to § 185, the court rejected one proposed alternative as being "a clear violation" of the CAA. *Id.* at 319, 321–22. But the court reaffirmed *South Coast*'s holding that while § 172(e) does not *expressly* apply when the NAAQS has been strengthened, EPA could permissibly interpret it to apply here. *Id.* at 319. The D.C. Circuit declined to rule on whether alternatives to § 185 might be acceptable if EPA found them to be "not less stringent," leaving that determination instead for a court that was presented with a specific alternative approved by EPA. The rule challenged here – EPA's approval of Rule 317 into

California's SIP – is such an alternative, which EPA has approved as being "not less stringent than" § 185.

## C. The South Coast Region and Rule 317

### 1. *Background of Rule 317*

The South Coast Air Quality Management District ("SCAQMD") has responsibility for air quality in the parts of California's Los Angeles, Orange, Riverside, and San Bernardino Counties that lie within the South Coast Air Basin. Cal. Health & Safety Code § 40410; Cal. Admin. Code § 60104 (describing the ambit of the South Coast Air Basin). According to rankings by the American Lung Association, this region is "the most ozone-polluted area in the country." State of the Air 2014, at 15 (2014).[2] As a result, parts of SCAQMD have been designated "severe" or "extreme" nonattainment areas ever since the 1990 CAA amendments first categorized air quality regions. *See* Designation of Areas for Air Quality Planning Purposes, 56 Fed. Reg. 56,694, 56,722 (Nov. 6, 1991).

SCAQMD adopted Rule 317, "Clean Air Act Non-Attainment Fee," on February 4, 2011. Rule 317 is intended to provide alternative "not less stringent" controls to what is required in § 185's anti-backsliding measures, as discussed above. Under Rule 317, SCAQMD must (1) calculate the fees that would have been assessed under § 185; (2) conduct an annual equivalency demonstration to prove that Rule 317 is generating at least the same amount of funds into the equivalency account as § 185 fees would have done;

---

[2] Available at http://www.stateoftheair.org/2014/assets/ALA-SOTA-2014-Full.pdf

(3) collect additional fees if there is any shortfall in the equivalency account. Rule 317 does not assess fees on "major stationary sources," unlike § 185. Rather, the rule collects fees from "qualified programs" that are "surplus to the [SIP for the one-hour NAAQS]" and are "designed to result in direct VOC or NOx reductions" or future reductions. These programs are generally aimed at reducing emissions from mobile sources, which account for over 80% of the emissions polluting the South Coast's air. SCAQMD Final Staff Report, Proposed Amended Rule 317 - Clean Air Act Non-Attainment Fees, at 1. The fees collected by Rule 317 are also required to be used to improve air quality, a requirement that § 185 lacks, and that is among the reasons Respondents say Rule 317 will be even more effective in achieving the Clean Air Act's aim of reducing pollution than would be a regular § 185 program of fees on major stationary sources.

## 2. *EPA's Approval of Rule 317*

EPA published a proposal to approve the rule as part of California's SIP on January 12, 2012. Revisions to the California State Implementation Plan, South Coast Air Quality Management District, 77 Fed. Reg. 1895. After notice and comment, on December 14, 2012, EPA issued a final rule approving Rule 317's incorporation into California's SIP. Revisions to the California State Implementation Plan, South Coast Air Quality Management District, 77 Fed. Reg. 74,372.

In the final rule, EPA responded to several comments from Earthjustice, the law firm representing Petitioners. In particular, Earthjustice objected "that nothing in the plain language of the [CAA], the 'principles' behind that language,

or [*South Coast*] gives EPA the power to rewrite the terms of section 185" or approve any alternatives to that control, and that § 172(e) is inapplicable because EPA had strengthened, not relaxed, the NAAQS. *Id.* at 74,375. EPA explained in response that § 185 was no longer directly applicable, since the one-hour NAAQS had been revoked, but that EPA was implementing § 185 and other controls via application of the principles of § 172(e) in order to prevent backsliding, even though § 172(e) did not directly apply to the context of a strengthened, rather than relaxed, NAAQS. EPA's final rule clearly articulated its reasoning:

> EPA's 8-hour ozone standard is recognized as a strengthening of the NAAQS, rather than a relaxation; however, EPA is applying the "principles" of section 172(e) to prevent backsliding of air quality in the transition from regulation of ozone pollution using a 1-hour metric to an 8-hour metric. Our application of the principles of section 172(e) in this context was upheld by the D.C. Circuit in the *South Coast* decision: "EPA retains the authority to revoke the one-hour standard so long as adequate anti-backsliding provisions are introduced." *South Coast*, 472 F.3d at 899. Further, the court stated, that in light of the revocation, "[t]he only remaining requirements as to the one-hour NAAQS are the anti-backsliding limitations." *Id.*

> . . . [S]ection 172(e) requires State Implementation Plans to contain "controls" that are "not less stringent" than the controls that applied to the area before the NAAQS

revision. EPA's 2004 Rule defined the term
"controls" in section 172(e) to exclude section
185. *See* 2004 Rule. The D.C. Circuit ruled
that EPA's exclusion of section 185 from the
list of "controls" for Severe and Extreme
non-attainment areas was improper [but did
not] address the specific issue of whether the
principles of section 172(e) required section
185 itself or any other controls not less
stringent, and section 172(e) clearly on its
face allows such equivalent programs.
Further, the court in [*NRDC I*] specifically
noted with respect to equivalent alternative
programs that, "neither the statute nor our
case law obviously precludes [the equivalent
program alternative.]" 643 F.3d at 321. In
this rulemaking approving SCAQMD Rule
317, EPA is fully recognizing section 185 as
a "control" that must be implemented through
the application of the principles of section
172(e). As explained above, the D.C. Circuit
stated that EPA must apply the principles of
section 172(e) to non-attainment requirements
such as section 185. Thus, we are following
the D.C. Circuit's holding that the principles
of section 172(e) apply in full to implement
[section] 185 obligations.

77 Fed. Reg. at 74,375.

With respect to Rule 317 specifically, EPA acknowledged
that the rule does not collect fees from major stationary
sources as § 185 would, but concluded that SCAQMD was
reasonable to focus on mobile source emissions, and that Rule

317's "fee equivalency account" would ensure that the fees collected by Rule 317 would be "at least equal to the amount collected under section 185," which EPA believed to be a reasonable measurement of equivalent stringency. *Id.* at 74,376. EPA also stated that "SCAQMD has demonstrated that Rule 317 will result in a federally enforceable requirement to obtain funding for and make expenditures on air pollution reduction projects in amounts at least equal to the amounts that would otherwise be collected under section 185." *Id.* Finally, EPA noted that since fees collected by Rule 317 are required to be used for pollution reduction programs, unlike fees collected by § 185, "it is reasonable to expect that in one respect SCAQMD's alternative program will achieve more emission reductions than direct implementation of section 185." *Id.*

Petitioners filed a petition for review of EPA's approval of Rule 317 in this court on February 12, 2013, and we have jurisdiction under CAA § 307(b)(1).[3]

---

[3] Intervenor National Environmental Development Association's Clean Air Act Project contends that Petitioners lack standing to bring this claim because they cannot make the requisite showing of causality between EPA's action and their alleged injury, since Petitioners do not argue that Rule 317 is "less stringent" and therefore bad for their members' health. However, even though Petitioners do not specifically challenge Rule 317, the declarations they submitted in support of standing demonstrate that their members may be harmed if EPA lacked authority to approve alternatives to § 185 fee programs. Because that question of authority is the central issue in this case, we conclude that Petitioners have standing to challenge EPA's authority to approve Rule 317.

## II. *Discussion*

### A. **Standard of Review**

As the CAA itself does not specify a standard of review, this court reviews any regulations promulgated in connection with it under the standard prescribed by the Administrative Procedure Act. *Sierra Club v. EPA*, 671 F.3d 955, 961 (9th Cir. 2012). Accordingly, we will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "[We] review the record to ensure that agency decisions are founded on a reasoned evaluation of the relevant factors, and may not rubberstamp . . . administrative decisions that [are] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute . . . ." *Latino Issues Forum v. EPA*, 558 F.3d 936, 941 (9th Cir. 2009) (quoting *Friends of Yosemite Valley v. Norton*, 348 F.3d 789, 793 (9th Cir. 2003)).

Further, we use the *Chevron* framework to review an agency's interpretation of a statute that it administers. The first of *Chevron*'s two steps investigates "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." 467 U.S. at 842–43. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843.

## B. *Chevron* Step One

*Chevron*'s first step is a textual inquiry in which the court must determine whether, in a given statute, "Congress has directly spoken to the precise question at issue." *Chevron*, 467 U.S. at 842–43. In this case, the question is whether Congress clearly indicated in the text of the CAA whether, if the NAAQS is strengthened rather than relaxed, EPA may approve alternative programs that are "not less stringent than" § 185 fee programs.

Petitioners argue that under step one of *Chevron*, § 172(e)'s language requiring EPA to promulgate alternative "not less stringent" programs clearly only applies when a NAAQS is relaxed, not strengthened, so with this textual clarity the court should end its analysis there and grant the petition. Petitioners make this argument notwithstanding the D.C. Circuit's *South Coast* decision upholding EPA's extension of the § 172(e) requirement of anti-backsliding *controls* (i.e., § 185 fee programs) to apply when the NAAQS has been strengthened: in Petitioners' view, the permissibility of extending anti-backsliding controls when the NAAQS has been strengthened does not mean that § 172(e)'s provision for EPA approving *other* controls that "are not less stringent than" § 185, should also be extended in the same context.

We disagree. Section 172(e) does not directly apply, either to impose § 185 fees or do anything else, because it does not provide for what happens in any context except when the NAAQS has been "relaxe[d]." In other words, Congress has not "directly spoken to the precise question at issue," which is what happens when the NAAQS has been strengthened. And as EPA points out, this *Chevron* step one question was effectively answered in the 2004 rule revoking

the one-hour NAAQS, where EPA explained its view that Congress had not spoken to what happens to the CAA's anti-backsliding rules if the NAAQS is strengthened, but reasoned that "if Congress intended areas to remain subject to the same level of control where a NAAQS was relaxed, they also intended that such controls not be weakened where the NAAQS is made more stringent." 69 Fed. Reg. 23,951, 23,972. As related in and approved by the *South Coast* decision, EPA previously interpreted part of the gap left by Congress to say which Subpart 2 "controls" are applicable to nonattainment areas when the NAAQS has been strengthened. At issue now is the remainder of the gap, addressing EPA's authority to promulgate controls that may be different, but that are "not less stringent than" § 185 fee programs and other Subpart 2 controls.

## C.  *Chevron* **Step Two**

Since "the statute is silent or ambiguous with respect to the specific issue," we proceed to *Chevron*'s second step, and determine "whether the agency's answer is based on a permissible construction of the statute." 467 U.S. at 843. EPA's answer in this case was to say, as it has since 2004, that § 172(e)'s language applies equally to the context of the NAAQS being strengthened as to the context of it being relaxed. Further, EPA concluded, since § 172(e) allows "controls which are not less stringent than the controls" applicable before the NAAQS was strengthened, a "not less stringent" control could be some program other than a strict application of § 185's fees from major stationary sources. We find this interpretation, and EPA's approval of Rule 317 based on it, to be reasonable, both textually and as a matter of policy and Congressional intent.

Textually, EPA's interpretation is reasonable because it is in keeping with the interpretation it previously gave to another part of the same sentence in the same statute. That is, in the 2004 Rule revoking the one-hour NAAQS, EPA concluded that the "controls" mentioned in § 172(e) will apply even though the NAAQS was strengthened rather than relaxed; now, EPA is giving the second part of the same clause in § 172(e) – "not less stringent than" – the same treatment. This makes intuitive linguistic sense: if one part of a sentence in a statute is being applied by analogy to a new context that was not provided for, it is difficult to see why another part of the same sentence should not also be applied by analogy, especially when it has the same effect: to impose controls requiring a certain level of stringency, even after conditions are changed.

This textual conclusion is also supported by the fact that, as EPA points out, there is no language in the CAA limiting the scope of § 172(e) to prevent it from applying to controls such as § 185, or otherwise restricting its application, but Congress did so limit other subsections of § 172. *See, e.g.*, CAA § 172(d), 42 U.S.C. § 7502(d) (requiring that SIP revisions comply with CAA § 110); CAA § 182(a), 42 U.S.C. § 7511a(a) (restricting application of § 172(c)(9)). Since it is clear that Congress knew how to limit § 172, and limited some subsections of the statute but not § 172(e), we can reasonably presume that Congress did not mean to limit the application of § 172(e) to provide for alternatives to § 185. *See United Transp. Union v. BNSF Ry. Co.*, 710 F.3d 915, 928 (9th Cir. 2013) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

With respect to Congressional policy and intent, as EPA, intervenors, and amici stress, this interpretation is reasonable because it promotes air quality, in keeping with the purpose of the CAA. EPA's interpretation allows EPA and states, in the wake of new scientific results leading to a new NAAQS, to take into account such changes in scientific knowledge and better tailor their SIPs. That way, in keeping with the cooperative federalist nature of the CAA, nonattainment areas with different air quality problems can address those problems with different solutions that may be more appropriate to their particular geographies, as long as those solutions are "not less stringent than" a § 185 fee program or other Subpart 2 controls. In the SCAQMD region, for example, major stationary sources are already strictly regulated and contribute a relatively small amount to ozone pollution, with other sources, such as cars and trucks, contributing much more. The SCAQMD staff determined that Rule 317, by collecting fees from other sources and then directing all assessed fees at reducing pollution, would tackle the problem of these other pollution sources, and thus move the region toward attainment, more quickly than (or at least as quickly as) § 185's strict fees on major stationary sources; EPA in approving Rule 317 concluded likewise.

This interpretation leads clearly from the D.C. Circuit's opinion in *South Coast*. To reiterate, the court there held that § 172(e)'s requirement for "not less stringent" controls to prevent backsliding applies not only when the NAAQS is relaxed but also when it is strengthened. 472 F.3d at 900. The court further held that there was no ambiguity in the word "control" and that it encompassed everything in the

CAA designed to limit ozone levels, including § 185. *Id.* at 902. The EPA had contended that § 185's penalty provision was not one of the controls "applicable" to nonattainment areas before the NAAQS was relaxed. The EPA's theory was that the control was not applicable, because the provision had not yet been enforced since the deadlines for compliance had not yet been reached. *Id.* at 902–903. The D.C. Circuit rejected that argument, holding that to be "applicable" within the meaning of § 172(e) the control need not be currently enforced. Because § 185 was designed to constrain pollution, it was an applicable "control." *Id.* at 903. That holding means that, pursuant to § 172(e), when the standard was relaxed, or strengthened, the EPA was required to promulgate controls "not less stringent" than the penalty provisions of § 185. Rule 317, EPA concluded here, is such a "not less stringent" control.

Moreover, contrary to Petitioners' claims, this interpretation of § 172(e) does not give EPA anything like the unfettered discretion that Congress sought to cut back when it enacted the 1990 amendments to the CAA. Rather, every program that EPA approves must be tied to § 185 and other relevant Subpart 2 controls by being "not less stringent than" them. This means EPA must assess each proposed alternative program for its stringency and compare – whether on the basis of fees or some other metric – the alternative program's claimed outcomes to the outcomes projected for Subpart 2 controls. EPA's interpretation of § 172(e) to give it authority to make this assessment and approve proper "not less stringent" alternatives is therefore reasonable.

We come then to Rule 317 itself. Petitioners do not challenge either EPA's way of measuring what makes an alternative program "not less stringent than" a § 185 fee

program, nor do they challenge EPA's ultimate conclusion that Rule 317 is "not less stringent," and may even be more stringent, than § 185. Their argument in this petition is purely statutory: it rises or falls with this court's conclusion about whether EPA can interpret the CAA's text to give it the authority to approve "not less stringent" alternatives, and does not address the actual merits of EPA's application of that authority to approve Rule 317. We have already concluded that EPA *can* so interpret the CAA, so that it does have the authority to approve alternatives to § 185 fee programs that are "not less stringent." Now, noting that the rulemaking record shows that SCAQMD constructed Rule 317 to collect an equivalent amount of fees to what it would collect with § 185 program, so that Rule 317 is "not less stringent than" a § 185 fee program, we conclude that EPA's approval of Rule 317 into California's SIP was a proper exercise of its authority under § 172(e) to approve such alternative, not less stringent, programs.

## III.   *Conclusion*

Because EPA reasonably interpreted CAA § 172(e) to give it authority to approve programs that are alternative to, but not less stringent than, § 185 fee programs, EPA's approval of Rule 317 as such an alternative program, after reasoned consideration and notice and comment procedure regarding Rule 317's stringency and approach to fee collecting, was proper. Therefore, the petition for review is **DENIED**.